# EXHIBIT A

1  JONATHAN K. LEVINE (SBN: 220289)
   ELIZABETH C. PRITZKER (SBN: 146267)
2  BETHANY L. CARACUZZO (SBN: 190687)
   SHIHO YAMAMOTO (SBN: 264741)
3  **PRITZKER LEVINE LLP**
   180 Grand Avenue, Suite 1390
4  Telephone: (415) 692-0772
   Facsimile: (415) 366-6110
5  Email: jkl@pritzkerlevine.com
          ecp@pritzkerlevine.com
6         bc@pritzkerlevine.com
          sy@pritzkerlevine.com
7
   Attorneys for Plaintiff ALLAN YOUNG
8

ENDORSED
FILED
ALAMEDA COUNTY

MAY 1 3 2016

CLERK OF THE SUPERIOR COURT
By _____
        CHERYL CLARK
                    Deputy

9

10           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11              **IN AND FOR THE COUNTY OF ALAMEDA**

12                    **UNLIMITED JURISDICTION**

13

| | |
|---|---|
| 14  ALLAN YOUNG, an individual, derivatively and on behalf of himself, | **Case No: RG-15-778891** |
| 15                    Plaintiff, | **VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT** |
| 16            vs. | **COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF** |
| 17  THOMAS M. HENDERSON, an individual; MICHAEL R. HENDERSON, an individual; | |
| 18  MATTHEW T. HENDERSON, an individual; SAN FRANCISCO REGIONAL CENTER, | **DEMAND FOR JURY TRIAL** |
| 19  LLC, a California Limited Liability Company; BERKELEY HEALTHCARE | |
| 20  DYNAMICS, L.P., a California Limited Partnership; CALIFORNIA GOLD MEDAL, | |
| 21  L.P., a California Limited Partnership; CALLTEKS SECURITY, LLC, a California | **ASSIGNED FOR ALL PURPOSES TO** Judge: Hon. Julia Spain |
| 22  Limited Liability Company; CITY BRAND MEDIA, LLC, a California Limited Liability | Dept.: 19 |
| 23  Company; IMMEDIA, LLC, a California Limited Liability Company; MAGNIN | |
| 24  EVENTS, LLC, a California Limited Liability Company; NORTH AMERICA 3PL, LLC, a | Complaint Filed: July 22, 2015 |
| 25  California Limited Liability Company; NORTH AMERICA 3PL, L.P., a California | Trial Date: August 4, 2017 |
| 26  Limited Partnership; TESH, LLC, a California Limited Liability Company; | |
| 27  COMPREHENSIVE CARE OF OAKLAND, L.P., a California Limited Partnership; THIS | |

28

---

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES,
INJUNCTIVE AND DECLARATORY RELIEF, CASE NO. RG-15-778891

1    IS THERE RESTAURANT GROUP, LLC, a
     California Limited Liability Company;
2    HYDRANT MEDIA, LLC, a California
     Limited Liability Company; HF TELCO,
3    LLC, a California Limited Liability Company;
     METRO WIFI RAIL, L.P., a California
4    Limited Partnership; JL GATEWAY, LLC, a
     California Limited Liability Company;
5    GEODOMAIN DEVELOPMENT
     VENTURES, LLC, an Arizona Limited
6    Liability Company; and DOES 1 – 25,

7                                 Defendants,

8                                    -and-

9    CALLSOCKET, LLC, a California Limited
     Liability Company; CALLSOCKET, L.P., a
10   California Limited Partnership;
     CALLSOCKET II, LLC, a California Limited
11   Liability Company; CALLSOCKET II, L.P., a
     California Limited Partnership;
12   CALLSOCKET III, LLC, a California
     Limited Liability Company; and
13   CALLSOCKET III, L.P., a California Limited
     Partnership,

14                            Nominal Defendants.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES,
INJUNCTIVE AND DECLARATORY RELIEF, CASE NO. RG-15-778891

Case: 16-42823    Doc# 33-1    Filed: 10/14/16    Entered: 10/14/16 16:18:40    Page 3 of
                                        49

Plaintiff Allan Young individually, and derivatively on behalf of nominal defendants CallSocket, LLC, CallSocket II, LLC and CallSocket III, LLC (the "CallSocket LLCs"), and CallSocket, L.P., CallSocket II, L.P. and CallSocket III, L.P. (the "CallSocket LPs") (the CallSocket LLCs and CallSocket LPs collectively are the "CallSocket Entities"), alleges the following by and through his attorneys of record:

## NATURE OF THE ACTION

1. Plaintiff owns a substantial interest in each of the CallSocket LLCs, which are California limited liability companies formed between July 2011 and February 2014. As an owner of the CallSocket LLCs, plaintiff also has a substantial interest in the revenues and profits of the CallSocket LPs, which are California limited partnerships formed between September 2011 and January 2013. The primary business purpose of the CallSocket Entities was to have been the ownership, development, management and operation of call centers authorized by the federal government to facilitate investments and job creation in the Oakland area under the federal EB-5 visa program.

2. For more than two years, plaintiff has been completely frozen out of the business and operations of the CallSocket Entities, in violation of the documents that govern each of the entities. Despite repeated requests to his co-owners for access to the books and records of the CallSocket Entities, plaintiff has been denied such access. He also has not received tax information for the CallSocket Entities or financial statements.

3. Plaintiff believes that he has been frozen out of the business and operations of the CallSocket Entities and deprived of the information described above because his co-owners, defendants San Francisco Regional Center, LLC ("SFRC"), Thomas Henderson ("Henderson") and his two sons, Michael Henderson and Matthew Henderson, and entities under their direct management and control (the "Henderson Entities," defined below), have been engaging in a continuing course of self-dealing using the assets and funds of the CallSocket Entities for their personal use and benefit unrelated to any legitimate company purpose and to the detriment of the CallSocket Entities and their members/limited partners.

4. In total, these defendants appear to have taken $53.5 million of investor funds that

- 1 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF, CASE NO. RG-15-778891

Case: 16-42823    Doc# 33-1    Filed: 10/14/16    Entered: 10/14/16 16:18:40    Page 4 of 49

has been commingled, used for purposes entirely unrelated to any of the CallSocket Entities, invested in entities owned and controlled by the Hendersons and SFRC, and used to speculate in and improve commercial real estate in downtown Oakland.

5.     Having deprived all of the CallSocket Entities of the funds they need to operate, the Hendersons and SFRC have all but ensured that the CallSocket Entities will not be profitable or even viable, and will not fulfill the sole purpose for which they were created, which was to create sustainable call center jobs in Oakland.

6.     Plaintiff brings this action derivatively, on behalf of the CallSocket Entities, and seeks damages, together with any appropriate declaratory, injunctive or other equitable relief, for the benefit of the CallSocket Entities for breaches of fiduciary duty, misappropriation of corporate assets, self-dealing, and other acts of wrong-doing by defendants as alleged herein.

7.     Plaintiff also brings this action in his individual capacity. As alleged below, plaintiff seeks damages for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, a declaration of his rights as an owner of the CallSocket LLCs, unfettered access to the books and records of the CallSocket Entities, violations of the Corporations Code, an accounting, injunctive relief, attorneys' fees and costs, and any such further relief as allowed or ordered by the Court.

## PARTIES TO THE ACTION

### Plaintiff

8.     Plaintiff is an individual who resides in San Francisco County, California.

9.     Plaintiff is a member and manager of and at all times relevant herein has owned and currently owns a 47.5% interest in CallSocket, LLC. Plaintiff is informed and believes and thereon alleges that defendant SFRC also is a member and manager of and at all times relevant herein has owned and currently owns a 47.5% interest in CallSocket, LLC. The third member of CallSocket, LLC is Max Shapiro, an individual who plaintiff is informed and believes and thereon alleges resides in Marin County, California. On information and belief, Mr. Shapiro has a 5 % ownership interest in CallSocket, LLC.

10.     The Operating Agreement for CallSocket, LLC is dated September 2, 2011 and

- 2 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF; CASE NO. RG-15-778891

Case 16-42823    Doc 95-1    Filed: 10/14/16    Entered: 10/14/16 16:18:40    Page 5 of 49

shows that plaintiff and defendant SFRC originally were co-owners, with each holding a 50% interest. In February 2013, plaintiff and defendant Henderson, on behalf of SFRC, executed an Assignment of Ownership Interest to provide Mr. Shapiro with his 5% interest and reduce the interests held by plaintiff and SFRC to 47.5% each.

11.     As a member of CallSocket, LLC, plaintiff also has an interest in the revenues and profits of CallSocket, L.P., including, among other things, the syndication fee and annual management fee paid by the CallSocket, L.P. limited partners and CallSocket, L.P.'s cash flow from operating profits and return of investments.

12.     Plaintiff is a member and manager of and at all times relevant herein has owned and currently owns a 50% interest in CallSocket II, LLC. Plaintiff is informed and believes and thereon alleges that defendant SFRC also is a member and manager of and at all times relevant herein has owned and currently owns a 50% interest in CallSocket II, LLC.

13.     Plaintiff signed the CallSocket II, LLC Operating Agreement at CallSocket's offices in the Tribune Tower sometime in October or November 2012, after plaintiff received an email message from defendant Henderson asking plaintiff to sign the Agreement as a 50% owner. Thereafter, including as recently as September 2015, CallSocket II, LLC reported to the Internal Revenue Service that plaintiff was a 50% owner of the company.

14.     As a member of CallSocket II, LLC, plaintiff also has an interest in the revenues and profits of CallSocket II, L.P., including, among other things, the syndication fee and annual management fee paid by the CallSocket II, L.P. limited partners and CallSocket II, L.P.'s cash flow from operating profits and return of investments.

15.     Plaintiff is a member and manager of and at all times relevant herein has owned and currently owns a 50% interest in CallSocket III, LLC.  Plaintiff is informed and believes and thereon alleges that defendant SFRC also is a member and manager of and at all times relevant herein has owned and currently owns a 50% interest in CallSocket III, LLC.

16.     As discussed in paragraphs 69 - 70 below, plaintiff and defendant Henderson agreed that the ownership of the three CallSocket LLCs would be the same and acted in accordance with that agreement thereafter.  Consistent with that agreement, plaintiff believes that he is a 50% owner

of CallSocket III, LLC and was held out as such by defendants Henderson and SFRC and by CallSocket III, LLC.

17. CallSocket III, LLC was formed in February 2014. At the time of its formation, plaintiff was requested by defendant Henderson to sign a declaration on behalf of CallSocket III that was provided to the U.S. Citizenship and Immigration Services ("USCIS"). Plaintiff signed the declaration as the managing director of CallSocket III, L.P., and would not have done so unless he was authorized to speak as a member and owner of CallSocket III, LLC, the general partner of the limited partnership. Plaintiff is also identified as a managing director of CallSocket III, L.P. in the business plan provided to potential limited partner investors. In addition to the foregoing, plaintiff believes that if and when defendants comply with their discovery obligations in this case, there will be substantial evidence confirming plaintiff's 50% interest in CallSocket III, LLC.

18. As a member of CallSocket III, LLC, plaintiff also has an interest in the revenues and profits of CallSocket III, L.P., including, among other things, the syndication fee and annual management fee paid by the CallSocket III, L.P. limited partners and CallSocket III, L.P.'s cash flow from operating profits and return of investments.

19. At no time prior to this lawsuit being filed in July 2015 was plaintiff ever told by any of the Henderson Defendants or defendant SFRC that plaintiff was not a member or owner of the three CallSocket LLCs.

20. To the contrary, the Henderson Defendants and defendant SFRC repeatedly held plaintiff out as a member of the CallSocket Entities. On behalf of the three CallSocket LLCs, plaintiff signed declarations that were provided to the USCIS for all three of the CallSocket LPs. And plaintiff was referred to in CallSocket offering documents, news articles and CallSocket press releases as defendant Henderson's partner, as a founder of CallSocket, as the CEO of the CallSocket LLCs and as the managing director of the CallSocket LPs.

**Defendants**

21. Plaintiff is informed and believes and thereon alleges that defendant Thomas M. Henderson is an individual who at all times mentioned herein resided and currently resides in Alameda County, California. As the manager of defendant SFRC, Henderson's name and

- 4 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF, CASE NO. RG-15-778891

Case: 16-42823    Doc# 55-1    Filed: 10/14/16    Entered: 10/14/16 16:18:40    Page 7 of 49

signature appear as the SFRC signatory on all the relevant agreements, including the operating agreements for the CallSocket LLCs and limited partnership agreements for the CallSocket LPs. Defendant Henderson and defendant SFRC are the alter egos of one another for the reasons set forth in paragraphs 54 - 61 below.

22. Plaintiff is informed and believes and thereon alleges that defendant Michael R. Henderson is an individual who at all times mentioned herein resided and currently resides in New York County, New York.

23. Plaintiff is informed and believes and thereon alleges that defendant Matthew T. Henderson is an individual who at all times mentioned herein resided and currently resides in Alameda County, California.

24. Defendants Michael Henderson and Matthew Henderson are defendant Henderson's sons. The term "Henderson Defendants" refers collectively to Henderson, Michael Henderson, Matthew Henderson and defendant SFRC.

25. Plaintiff is informed and believes and thereon alleges that defendant SFRC is a limited liability company formed in September 2010 and existing under the laws of the State of California, with its principal place of business located in Alameda County, California. Defendant Henderson and his two sons are the sole managing members and owners of defendant SFRC. Defendant Henderson is the agent for service of process on defendant SFRC.

26. Plaintiff is informed and believes and thereon alleges that defendant Berkeley Healthcare Dynamics, L.P. is a limited partnership formed in October 2012 and existing under the laws of the State of California, with its principal place of business located in Alameda County, California. Defendant Berkeley Healthcare Dynamics, L.P. is managed, operated and controlled by the Henderson Defendants. Defendant Henderson is the agent for service of process on defendant Berkeley Healthcare Dynamics, L.P.

27. Plaintiff is informed and believes and thereon alleges that defendant California Gold Medal, L.P. is a limited partnership formed in March 2015 and existing under the laws of the State of California, with its principal place of business located in Alameda County, California. Defendant California Gold Medal, L.P. is managed, operated and controlled by the Henderson

- 5 -

Case: 16-42823    Doc# 59-1    Filed: 10/14/16    Entered: 10/14/16 16:18:40    Page 8 of 49

Defendants. Defendant Henderson is the agent for service of process on defendant California Gold Medal, L.P.

28. Plaintiff is informed and believes and thereon alleges that defendant CallTeks Security, LLC is a limited liability company formed in October 2013 and existing under the laws of the State of California, with its principal place of business located in Alameda County, California. Defendant CallTeks Security, LLC is managed, operated and controlled by the Henderson Defendants. Defendant Henderson is the agent for service of process on defendant CallTeks Security, LLC.

29. Plaintiff is informed and believes and thereon alleges that defendant City Brand Media, LLC is a limited liability company formed in December 2014 and existing under the laws of the State of California, with its principal place of business located in Alameda County, California. Defendant City Brand Media, LLC is managed, operated and controlled by the Henderson Defendants. Defendant Henderson is the agent for service of process on defendant City Brand Media, LLC.

30. Plaintiff is informed and believes and thereon alleges that defendant Immedia, LLC is a limited liability company formed in September 2010 and existing under the laws of the State of California, with its principal place of business located in Alameda County, California. Defendant Immedia, LLC is managed, operated and controlled by the Henderson Defendants. Defendant Henderson is the agent for service of process on defendant Immedia, LLC.

31. Plaintiff is informed and believes and thereon alleges that defendant Magnin Events, LLC is a limited liability company formed in October 2014 and existing under the laws of the State of California, with its principal place of business located in Alameda County, California. Defendant Magnin Events, LLC is managed, operated and controlled by the Henderson Defendants. Defendant Henderson is the agent for service of process on defendant Magnin Events, LLC.

32. Plaintiff is informed and believes and thereon alleges that defendant North America 3PL, LLC is a limited liability company formed in July 2010 and existing under the laws of the State of California, with its principal place of business located in Alameda County, California.

- 6 -

1  Defendant North America 3PL, LLC is managed, operated and controlled by the Henderson

2  Defendants. Defendant Henderson is the agent for service of process on defendant North America

3  3PL, LCC.

4      33.    Plaintiff is informed and believes and thereon alleges that defendant North America

5  3PL, L.P. is a limited partnership formed in August 2010 and existing under the laws of the State

6  of California, with its principal place of business located in Alameda County, California.

7  Defendant North America 3PL, L.P. is managed, operated and controlled by the Henderson

8  Defendants. Defendant Henderson is the agent for service of process on defendant North America

9  3PL, L.P.

10      34.    Plaintiff is informed and believes and thereon alleges that defendant Tesh, LLC is a

11  limited liability company formed in July 2013 and existing under the laws of the State of

12  California, with its principal place of business located in Alameda County, California. Defendant

13  Tesh, LLC is managed, operated and controlled by the Henderson Defendants. Defendant

14  Henderson is the agent for service of process on defendant Tesh, LLC.

15      35.    Plaintiff is informed and believes and thereon alleges that defendant Comprehensive

16  Care of Oakland, L.P. is a limited partnership formed in September 2010 and existing under the

17  laws of the State of California, with its principal place of business located in Alameda County,

18  California. Defendant Comprehensive Care of Oakland, L.P. is managed, operated and controlled

19  by the Henderson Defendants. Defendant Henderson is the agent for service of process on

20  defendant Comprehensive Care of Oakland, L.P.

21      36.    Plaintiff is informed and believes and thereon alleges that defendant This is There

22  Restaurant Group, LLC is a limited liability company formed in January 2013 and existing under

23  the laws of the State of California, with its principal place of business located in Alameda County,

24  California. This is There Restaurant Group, LLC is synonymous with the Tribune Tavern, a

25  restaurant located in the Tribune Tower in downtown Oakland. Defendant This is There

26  Restaurant Group, LLC is managed, operated and controlled by the Henderson Defendants.

27  Defendant Henderson is the agent for service of process on defendant This is There Restaurant

28  Group, LLC.

- 7 -

Case: 16-42823   Doc# 39-1   Filed: 10/14/16   Entered: 10/14/16 16:18:40   Page 10
of 49

37. Plaintiff is informed and believes and thereon alleges that defendant Hydrant Media, LLC is a limited liability company formed in August 2014 and existing under the laws of the State of California, with its principal place of business located in Alameda County, California. Defendant Hydrant Media, LLC is managed, operated and controlled by the Henderson Defendants. Defendant Henderson is the agent for service of process on defendant Hydrant Media, LLC.

38. Plaintiff is informed and believes and thereon alleges that defendant HF Telco, LLC is a limited liability company formed in March 2015 and existing under the laws of the State of California, with its principal place of business located in Alameda County, California. Defendant HF Telco, LLC is managed, operated and controlled by the Henderson Defendants. Defendant Henderson is the agent for service of process on defendant HF Telco, LLC.

39. Plaintiff is informed and believes and thereon alleges that defendant Metro WiFi Rail, L.P. is a limited partnership formed in November 2015 and existing under the laws of the State of California, with its principal place of business located in Alameda County, California. Defendant Metro WiFi Rail, L.P. is managed, operated and controlled by the Henderson Defendants. Defendant Henderson is the agent for service of process on defendant Metro WiFi Rail, L.P.

40. Plaintiff is informed and believes and thereon alleges that defendant JL Gateway, LLC is a limited liability company formed in June 2014 and existing under the laws of the State of California, with its principal place of business located in Alameda County, California. Defendant JL Gateway, LLC is managed, operated and controlled by the Henderson Defendants. Defendant Henderson is the agent for service of process on defendant JL Gateway, LLC.

41. Plaintiff is informed and believes and thereon alleges that defendant GeoDomain Development Ventures, LLC is a limited liability company formed in March 2010 and existing under the laws of the State of Arizona, with its principal place of business located in Maricopa County, Arizona. Defendant GeoDomain Development Ventures is managed, operated and controlled by the Henderson Defendants.

42. Defendants Berkeley Healthcare Dynamics, L.P., California Gold Medal, L.P.,

- 8 -

CallTeks Security, LLC, City Brand Media, LLC, Immedia, LLC, Magnin Events, LLC, North America 3PL, LLC, North America 3PL, L.P., Tesh, LLC, Comprehensive Care of Oakland, L.P., This is There Restaurant Group, LLC, Hydrant Media, LLC, HF Telco, LLC, Metro WiFi Rail, L.P., JL Gateway, LLC and GeoDomain Development Ventures, LLC, identified in paragraphs 26 - 41 above, are referred to collectively as the "Henderson Entities."

43. The Henderson Entities, along with defendant SFRC, are named as defendants herein because each of these entities is alleged to have commingled funds with one or more of the CallSocket Entities, taken funds from or provided funds to one or more of the CallSocket Entities, or otherwise improperly obtained something of value from one or more of the CallSocket Entities, such as free rent or having certain business expenses billed to and paid by one or more of the CallSocket Entities.

44. Plaintiff is currently unaware of the true names and capacities of defendants named herein as DOES 1 through 25, inclusive, and plaintiff therefore sues those defendants by fictitious names pursuant to California Code of Civil Procedure § 474. Plaintiff will amend this complaint to state the true names and capacities of those defendants sued herein as DOES when ascertained. Plaintiff alleges on information and belief that each fictitiously named defendant is in some manner responsible for the acts alleged herein and that they proximately caused the injuries to plaintiff as alleged herein.

**Nominal Defendants**

45. Nominal defendant CallSocket, LLC is a limited liability company formed in July 2011 and existing under the laws of the State of California, with its principal place of business located in Alameda County, California.

46. Nominal defendant CallSocket, L.P., a limited partnership formed in September 2011 and existing under the laws of the State of California, with its principal place of business located in Alameda County, California. CallSocket, L.P. had 36 limited partner investors, who contributed $18 million in investment capital and $1.8 million in syndication fees. CallSocket, LLC is the general partner of CallSocket, L.P.

47. Nominal defendant CallSocket II, LLC is a limited liability company formed in June

- 9 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF, CASE NO. RG 15-778891

Case: 16-42823    Doc# 35-1    Filed: 10/14/16    Entered: 10/14/16 16:18:40    Page 12 of 49

2012 and existing under the laws of the State of California, with its principal place of business located in Alameda County, California.

48. Nominal defendant CallSocket II, L.P., a limited partnership formed in June 2012 and existing under the laws of the State of California, with its principal place of business located in Alameda County, California. CallSocket II, L.P. had 31 limited partner investors, who contributed $15.5 million in investment capital and $1.5 million in syndication fees. CallSocket II, LLC is the general partner of CallSocket II, L.P.

49. Nominal defendant CallSocket III, LLC is a limited liability company formed in February 2014 and existing under the laws of the State of California, with its principal place of business located in Alameda County, California.

50. Nominal defendant CallSocket III, L.P., a limited partnership formed in January 2013 and existing under the laws of the State of California, with its principal place of business located in Alameda County, California. CallSocket III, L.P. had 40 limited partner investors, who contributed $20 million in investment capital and $2 million in syndication fees. CallSocket III, LLC is the general partner of CallSocket III, L.P.

51. The CallSocket Entities identified in paragraphs 45 - 50 above are named in this complaint as nominal defendants in their derivative capacity, and this action is brought derivatively on their behalf.

52. The CallSocket Entities identified in paragraphs 45 - 50 above are completely controlled and dominated by the Henderson Defendants. Defendant Henderson is the agent for service of process on all of the CallSocket Entities.

53. Set forth below is a diagram showing the relationship between the Henderson Defendants, the CallSocket Entities and the Henderson Entities:

//
//
//
//
//

- 10 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF, CASE NO. RG-15-778891

Case: 16-42823    Doc# 35-1    Filed: 10/14/16    Entered: 10/14/16 16:18:40    Page 13 of 49



VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES
INJUNCTIVE AND DECLARATORY RELIEF, CASE NO. RG-15-778891

## AGENCY AND ALTER EGO

54.     Plaintiff is informed and believes and thereon alleges that at all times herein mentioned each of the defendants, in addition to acting for himself, herself or its own behalf individually, is now and was at all material times acting as an agent, principal, employee, servant or representative of each other defendant and in doing the things hereinafter alleged, was acting within the course and scope of such relationships and with the permission, consent and ratification of each and every other defendant, and is directly and proximately responsible for the injuries and damages sustained by plaintiff and the CallSocket Entities, as described below.

55.     Defendant Henderson also is liable for the liability and obligations of defendant SFRC and each and all of the defendant Henderson Entities under alter ego theories.

56.     There is a sufficient unity of interest and ownership between defendant Henderson, on the one hand, and SFRC and the defendant Henderson Entities on the other. Defendant Henderson and his sons, Michael and Matthew Henderson, have sole ownership of SFRC. In prior legal proceedings in which defendant Henderson provided sworn testimony, Henderson admitted that he originally owned 100 percent of SFRC, and later gifted certain ownership interests in that entity to his sons, Michael and Matthew Henderson.

57.     Defendant Henderson, furthermore, personally manages defendant SFRC, has complete control of SFRC, makes all of the day-to-day decisions for SFRC, and has sole control of SFRC's funds and other assets.  The Henderson Entities are also managed by and under the control of defendant Henderson, either directly or through his control of defendant SFRC.

58.     The CallSocket Entities, in turn, are completely controlled and dominated by the Henderson Defendants, establishing a unity of interest and ownership for purposes of alter ego liability.

59.     Neither defendant SFRC nor any of the defendant Henderson Entities adhere to corporate formalities, are adequately capitalized, or properly maintain separate finances.  To the contrary, the Henderson Defendants have routinely comingled funds between SFRC, the various Henderson Entities and the CallSocket Entities.  Even though defendant SFRC is "zero capitalized," defendant Henderson has admitted that he routinely uses SFRC funds to pay his

- 12 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES,
INJUNCTIVE AND DECLARATORY RELIEF, CASE NO. RG 15787891

Case: 16-42823    Doc# 58-9   Filed: 04/13/16   Entered: 04/13/16 15:37:28   Page 15 of 49

personal bills by way of distributions and advances to himself – advances that Henderson admits that he has never paid back nor believes he is required to pay back to SFRC.

60. Furthermore, as alleged in paragraphs 85 – 91 and 97 - 113 below, defendant Henderson has been engaging in a continuing course of self-dealing that includes: (a) the unauthorized use of the assets and funds of the CallSocket Entities for his own personal benefit; (b) secretly and without authorization acquiring real property, personal property or businesses in his name, in the names of his sons, Michael and Matthew Henderson, or in the names of business entities which the Henderson Defendants control or have an interest in, including all of the Henderson Entities; (c) secretly and without authorization diverting funds and assets of the CallSocket Entities into separate bank accounts; (d) secretly and without authorization entering into leases of real property purchased with the assets of the CallSocket Entities; and (e) secretly and without authorization using the lease income and profits derived from such real property leases and real estate purchases as personal income or for personal benefit.

61. As the sole controlling member of defendant SFRC and the controlling member of all of the defendant Henderson Entities, all of these acts were done by defendant Henderson individually. In short, defendant Henderson is the architect, implementer and primary beneficiary of these wrongful acts – all of which were done in the name of SFRC and the Henderson Entities. Treating these wrongful acts by defendant Henderson as the acts of SFRC or the Henderson Entities alone, would sanction a fraud, prompt injustice and cause an inequitable result.

## JURISDICTION AND VENUE

62. This Court has jurisdiction over this action under California Code of Civil Procedure § 410.10 and Article VI, § 10 of the California Constitution. The injuries and damages alleged herein are in an amount within the jurisdiction of this Court.

63. This Court also has jurisdiction over this action pursuant to the CallSocket LLC Operating Agreements alleged herein, which each provide that any action on a claim arising out of, under, or in connection with the Agreements or transactions contemplated by the Agreements shall be subject to the exclusive jurisdiction of the state and federal courts sitting in California, and that the parties to the CallSocket LLC Operating Agreements consent to the personal jurisdiction of this

- 13 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF; CASE NO. RG15-774891

Case: 16-42823    Doc# 561    Filed: 11/04/16    Entered: 11/04/16 15:37:48    Page 16 of 49

Court.

64.     The acts of defendants alleged herein occurred in Alameda County, California. Venue is proper is this Court under California Code of Civil Procedure § 395(a).

## SUBSTANTIVE ALLEGATIONS

65.     The EB-5 immigrant investor program was created by the federal government in 1990 to generate a significant inward flow of foreign capital and create jobs for U.S. workers. Under the program, as enacted and subsequently modified, an immigrant investor who invests a minimum of $500,000 in the U.S. to create at least 10 full-time jobs in a targeted employment area (defined as a location with unemployment at or above 150% of the national average unemployment rate) is entitled to a two-year provisional visa and, if the jobs are created and maintained for at least a two year period, permanent residence status in the U.S.

### The CallSocket Entities Are Created

66.     Plaintiff was first introduced to defendant Henderson in 2010 by Max Shapiro, a recruiter and executive headhunter in San Francisco. Mr. Shapiro subsequently became the Director of Operations at defendant SFRC. According to Mr. Shapiro, defendant Henderson needed help creating a business that would qualify for the federal EB-5 program.

67.     At their first meeting, defendant Henderson told plaintiff that he had many potential Chinese investors interested in investing in the United States in order to obtain permanent residence status, but that he could not come up with a business plan that would meet the jobs-creation criteria under the EB-5 program.

68.     Plaintiff came up with the idea of a telephone call center, which had the potential to create a significant number of jobs that were likely to qualify under the EB-5 program. Soon thereafter, plaintiff and defendant Henderson agreed to work together to bring to fruition plaintiff's call center business concept using investment funds raised oversees by defendant Henderson's business contacts in China.

69.     Plaintiff and defendant Henderson agreed that they would be equal partners in the business venture, which they agreed to call CallSocket, a name that plaintiff came up with. For business reasons, defendant Henderson wanted there to be multiple CallSocket entities, each with

- 14 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF, CASE NO. RG-15-778891

Case: 16-42823    Doc# 35-1    Filed: 10/18/16    Entered: 10/18/16 16:18:40    Page 17 of 49

a limited number of investors, rather than a single one that grew over time, so he created CallSocket II, LLC and CallSocket III, LLC to manage and operate the related limited partnerships.

70.    All three of the CallSocket LLCs had the same business plan and business model, and it was understood by plaintiff and defendant Henderson that the management, operation and ownership of the three entities would be the same (i.e., that plaintiff and defendant Henderson, through SFRC, would be equal partners).

71.    The primary business purpose of the three CallSocket LLCs was to develop, manage and operate the related CallSocket LPs on behalf of the foreign limited partner investors.  The limited partners would be passive investors and each CallSocket LP would be managed, operated and controlled entirely by the related CallSocket LLC.

72.    In exchange for the work performed on behalf of the limited partners, each CallSocket LLC was entitled to an upfront $50,000 syndication fee from each limited partner in the related limited partnership (over and above the $500,000 capital contribution), an annual management fee of 2% of the initial capital contribution ($10,000 per investor per year), 50% of the cash flow from operating profits and 50% of the cash flow from return of investments.

73.    Ultimately, there were a total of 104 limited partner investors in the three CallSocket LPs, resulting in upfront syndication fees totaling $5,200,000 and annual management fees totaling $1,040,000 that were paid to the three related CallSocket LLCs.

74.    Plaintiff and defendant Henderson had different responsibilities with respect to the CallSocket Entities.  Defendant Henderson handled corporate formation, set up the CallSocket LPs, dealt with attorneys and the federal government about the EB-5 program and its requirements, prepared and signed the offering materials that were provided to the investors, managed the finances, and raised funds from the overseas investors that would become CallSocket limited partners.  Plaintiff's responsibility was to come up with a business plan for the limited partnerships that would satisfy the criteria for the EB-5 program, create a technology platform to operate the business, hire staff, and develop business partners and customers for the call center.

75.    Plaintiff did not receive a salary from any of the CallSocket Entities, defendant SFRC, or any of the other Henderson Entities.  Other than being reimbursed for some modest

- 15 -

expenses incurred while working on behalf of the CallSocket Entities, plaintiff has not otherwise received any compensation or other funds from any CallSocket Entity, any of the Henderson Entities, or any other defendant in this case.

**The CallSocket Operating Agreements**

76.    The management and operation of each of the three CallSocket LLCs was governed by an operating agreement (hereinafter, the "CallSocket Operating Agreements") that was signed by defendant Henderson as the manager and alter ego of SFRC. A copy of the CallSocket, LLC Operating Agreement is attached hereto as Exhibit A as an example.

77.    Paragraph 4.3 of the CallSocket Operating Agreements sets forth the powers (and limitations of such powers) that are held by each manager (including defendants Henderson and SFRC) of each CallSocket LLC, stating, in pertinent part:

Subject to the terms of this Agreement, the Managers shall manage the business, property and affairs of the Company, and shall have all powers needed to do so, including without limitation, the power to exercise all of the powers described in California Corporations Code Section 17003. Notwithstanding the foregoing, a Member shall not have the authority hereunder to cause the Company to engage in the following transactions without first obtaining the affirmative vote or written consent of Members holding a Majority Interest; (i) the Sale, exchange or other disposition of all, substantially all the Company's assets (unless pursuant to the Company's duly authorized dissolution); (ii) the merger of the Company with another limited liability company, limited partnership, corporation, general partnership or other person...; (iii) the establishment of different classes of Members; (iv) transactions between the Company and the Manager or an affiliate of the Manager, or transactions in which the Manager has a material financial interest; (v) any act which would make it impossible to carry on the ordinary business of the Company; (vi) the confession of a judgment against the Company; or (vii) any other transaction described herein which requires the approval of the Members.

- 16 -
VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF, CASE NO. RG13727891

78.    Paragraph 4.7 of the CallSocket Operating Agreements places express limits on transactions between the CallSocket LLCs and any manager, stating, in pertinent part:

*Upon full and complete disclosure to the Members, and the approval by disinterested Members holding a Majority Interest,* a Manager and/or his Affiliate may engage in any transaction (including, without limitation, the purchase, sale, lease, or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment) with the Company so long as such transaction is not expressly prohibited by this Agreement and the terms and conditions of such transaction, on an overall basis, are as fair and reasonable to the Company as those that are generally available to parties operating at arm's length.  (bold italics added).

79.    Paragraph 5.5 of the CallSocket Operating Agreements describes the procedure for the allocation of net profits and losses to persons or entities with a membership interest in the CallSocket LLCs.  Paragraph 5.5 states, in pertinent part:

If any Membership Interest is transferred, increased or decreased during any Fiscal year of the Company, *each item of income, gain, loss, deduction or credit of the Company for such fiscal Year shall be assigned pro rata* to each day in the particular period of such Fiscal year to which such item is attributable (i.e., the day it is accrued or incurred) *and allocated to each Member based upon his or her respective Membership Interest* at the close of such day.  (bold italics added).

80.    Paragraph 5.6 of the CallSocket Operating Agreements discusses member distributions, and states, in pertinent part, that:

Subject to the applicable law and this Agreement, *a Manager may distribute "Distributable Cash" to the Members in the following order of priority*; (a) to Members in proportion to their unreturned Capital Contributions until each Member's Capital Contributions are recovered; and (b) *to the Members in proportion to their Percentage Interests*.  All such distributions shall be made

- 17 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF; CASE NO. RG15-787491

Case: 16-42823    Doc# 95    Filed: 05/31/19    Entered: 05/31/19 16:55:11    Page 20 of 49

only to Persons who are holders of record of the Economic Interests on the actual
date of distribution. (bold italics added).

81. Paragraph 8.4. of the CallSocket Operating Agreements, concerning the bank accounts of each CallSocket LLC, states that:

The Managers shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and *shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person*. (bold italics added).

82. Paragraph 8.3 of the CallSocket Operating Agreements requires that a designated manager (defendants SFRC and Henderson) prepare and deliver an annual statement containing specific financial information to each CallSocket LLC's members:

A Manager shall prepare and send an annual report to each of the Members not less than 120 days after the close of each Fiscal Year. The report shall contain a balance sheet as of the end of the Fiscal Year and an income statement and statement of changes in financial position for the Fiscal Year. Such financial statements shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of the Managers that the financial statements were prepared without audit from the books and records of the Company.

83. Paragraph 8.1 of the CallSocket Operating Agreements, concerning the books and records of each CallSocket LLC, states that:

The books and records of the Company shall reflect all Company transactions and shall be kept in accordance with the accounting methods followed for federal income tax purposes. *The company shall maintain at its principal office in California all of the following*: (i) a current list of the full name and last known business or residence address of each Member and Economic Interest Owner, together with the Capital Contributions, Capital Account and Percentage Interest of each Member and Economic Interest Owner; (ii) the full name and business or

- 18 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES,
INJUNCTIVE AND DECLARATORY RELIEF; CASE NO. RG-15-779891

Case: 16-42823    Doc# 18    Filed: 03/07/16    Entered: 03/07/16 15:17:38    Page 21 of 49

residence address of each Manager; (iii) a copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed; (iv) *copies of the Companies federal, state and local income tax or information returns and reports, if any, for the six most recent taxable years*; (v) a copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed; (vi) *copies of the financial statements of the Company, if any, for the six most recent Fiscal Years*; and (vii) *the Company's books and records for at least the current and past four Fiscal Years*. (bold italics added).

84. Paragraph 8.2 of the CallSocket Operating Agreements grants to each member of each CallSocket LLC the right to inspect the books and records of that entity, as follows:

Each Member, Manager and Economic Interest Owner *has the right, upon reasonable request for purposes reasonably related to the interests of the Person as Member*, Manager or Economic Interest Owner, to (i) inspect and copy during normal business hours any of the Company records described in Section 8.1; and (ii) obtain from the Managers, promptly after becoming available, a copy of the Company's federal, state, and local tax or information returns for each Fiscal Year. (bold italics added).

**The Henderson Defendants' Breaches of the CallSocket Operation Agreements**

85. Plaintiff alleges that the Henderson Defendants, and each of them, breached their fiduciary and contractual obligations under the CallSocket Operating Agreements, and violated California law, as follows.

86. The Henderson Defendants breached paragraphs 4.3 and 4.7 of the CallSocket Operating Agreements, set forth above, by repeatedly engaging in related party transactions that were neither approved by nor disclosed to plaintiff, by engaging in related party transactions that

- 19 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF; CASE NO. RG15-157891

Case: 16-42823    Doc# 611    Filed: 06/13/18    Entered: 06/13/18    Page 22 of 49

were neither fair nor reasonable under an arm's length standard, and by engaging in acts that made it impossible to carry on the ordinary business of the CallSocket LLCs. The Henderson Defendants hid these acts by freezing plaintiff out of the business and operations of the CallSocket LLCs, falsifying the financial statements of the CallSocket LLCs, refusing to provide plaintiff with financial and tax information that he is entitled to, and refusing to provide plaintiff with access to the books and records of the CallSocket LLCs.

87. The Henderson Defendants breached paragraphs 5.5 and 5.6 of the CallSocket Operating Agreements, set forth above, by failing to properly allocate and account for profits, losses, expenses and income for each of the CallSocket LLCs and failing to properly allocate distributions to the members of each of the CallSocket LLCs. The Henderson Defendants hid these acts by freezing plaintiff out of the business and operations of the CallSocket LLCs, falsifying the financial statements of the CallSocket LLCs, refusing to provide plaintiff with financial and tax information that he is entitled to, and refusing to provide plaintiff with access to the books and records of the CallSocket LLCs.

88. The Henderson Defendants breached paragraph 8.4 of the CallSocket Operating Agreements, set forth above, by failing to maintain separate bank accounts for each of the CallSocket LLCs and routinely commingling the funds of the CallSocket LLCs with the funds of defendant SFRC, other CallSocket Entities, and other Henderson Entities. The Henderson Defendants hid these acts by freezing plaintiff out of the business and operations of the CallSocket LLCs, falsifying the financial statements of the CallSocket LLCs, refusing to provide plaintiff with financial and tax information that he is entitled to, and refusing to provide plaintiff with access to the books and records of the CallSocket LLCs.

89. The Henderson Defendants breached paragraph 8.3 of the CallSocket Operating Agreements, set forth above, by failing to provide plaintiff with annual financial statements for all of the CallSocket LLCs.

90. The Henderson Defendants breached paragraph 8.1 of the CallSocket Operating Agreements, set forth above, by failing to maintain proper books and records for each of the CallSocket LLCs. The Henderson Defendants hid these acts by freezing plaintiff out of the business

- 20 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF; CASE NO. CGC-15-546091

Case: 16-42823    Doc# 35    Filed: 01/06/17    Entered: 01/06/17 13:37:49    Page 23 of 49

and operations of the CallSocket LLCs, falsifying the financial statements of the CallSocket LLCs, refusing to provide plaintiff with financial and tax information that he is entitled to, and refusing to provide plaintiff with access to the books and records of the CallSocket LLCs.

91.     The Henderson Defendants breached paragraph 8.2 of the CallSocket Operating Agreements, set forth above, by refusing to grant plaintiff access to inspect the books and records of the CallSocket LLCs.

**The CallSocket Offering Documents**

92.     Potential foreign investors for the three CallSocket LPs were solicited by the Henderson Defendants using three documents; a private placement memorandum, a business plan, and a limited partnership agreement (collectively, the "Offering Documents"). The Offering Documents described how each of the CallSocket LPs would be managed and operated, what the primary business purpose was for each limited partnership, how the business purpose would be accomplished, what the projections and anticipated profits were expected to be, what investor funds would be used for, and what the potential risks were for the limited partner investors. Copies of the Offering Documents for CallSocket, L.P. are attached hereto as Exhibits B (private placement memorandum), C (business plan) and D (limited partnership agreement) as examples.

93.     In the Offering Documents for the three CallSocket LPs, the Henderson Defendants made the following representations, among others, to the limited partner investors:

(a)     That investment capital (the $500,000 from each limited partner) would only be used for job-creating investments in the relevant geographic area;

(b)     That the business objective and business purpose of each of the CallSocket LPs was to operate a call center in Oakland;

(c)     That in order to protect each limited partner's investment, all of the investment capital would be invested in the CallSocket LP;

(d)     That the general partner would only make investments that met the job creation requirements of the EB-5 program;

(e)     That the only payments defendant SFRC would receive from the CallSocket LPs would be portions of the amounts due to the general partner of each limited

- 21 -

partnership for syndication fees, the annual management fee and the cash flow from operating cash and return of investments;

(f)     That the ordinary and recurring expenses of the CallSocket LPs would be paid by the general partner of each limited partnership out of the annual management fee the general partner received from the limited partnership;

(g)     That each of the CallSocket LPs was projected to have at least $10 million in revenues in the first year of operations, with revenues increasing each year thereafter and doubling within five years; and

(h)     That each of the CallSocket LPs was projected to be profitable in the first year of operations, with profits increasing each year thereafter.

94.     In addition to the foregoing representations that are common for all the three CallSocket LPs, the Henderson Defendants also represented in the Offering Documents for CallSocket, L.P. and CallSocket III, L.P. that the call centers would be located in leased spaces in Oakland and described for each the lease terms.

95.     With respect to the Offering Documents for CallSocket II, L.P. and CallSocket III, L.P., the Henderson Defendants also represented that those offerings were being conducted to building on the success of the first CallSocket call center.

96.     None of the representations by the Henderson Defendants set forth in paragraph 93 above were true, for the reasons set forth below.

**The Henderson Defendants' Breaches of the CallSocket Offering Documents**

97.     Contrary to the representations by the Henderson Defendants in the Offering Documents, investment capital (the $500,000 from each limited partner) was not used only for job-creating investments in the relevant geographic area.  Most of the investment capital was used improperly by the Henderson Defendants to speculate in and improve commercial real estate (including the purchase and improvement of four buildings in downtown Oakland), to invest in or pay the expenses for numerous other Henderson Entities (some of which were not even located in the relevant geographic area), to pay the expenses of SFRC and its employees (including salaries,

- 22 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF, CASE NO. RG-15-778391

Case: 16-42823    Doc# 11    Filed 12/14/16    Entered 12/14/16 16:57:48    Page 25 of 49

1 meals, travel and entertainment), and to pay finders' fees for bringing in new investors (including

2 a $2.3 million commission paid to one individual in China).

3     98.    Contrary to the representations by the Henderson Defendants in the Offering

4 Documents, the true business objective and business purpose of each of the CallSocket LPs was not

5 to operate a call center in Oakland; rather it was simply to raise millions of dollars that the

6 Henderson Defendants could take to use for their own purposes, which included speculating in

7 commercial real estate, financing the personal lives of the Henderson Defendants, and financing

8 numerous other business ventures entirely unrelated to the call centers. The fact that CallSocket II,

9 L.P. and CallSocket III, L.P. raised $35.5 million in investment capital to run two call centers, but

10 then had no funds available for either entity to start or run a call center, is the most glaring example

11 of this, but certainly not the only one.

12     99.    Contrary to the representations by the Henderson Defendants in the Offering

13 Documents, all of the investment capital contributed by the limited partners was not invested solely

14 in the CallSocket LPs. It is impossible to determine whether any of the investment capital

15 contributed by the limited partners actually was invested in any of the CallSocket LPs, because as

16 soon as a limited partner made an investment in one of the CallSocket LPs, defendant Henderson

17 almost immediately transferred all of the funds to defendant SFRC for its use. Defendant

18 Henderson then transferred funds back to each of the CallSocket LPs on an as needed basis, but it

19 is unlikely that the funds transferred in by defendant Henderson were the same funds transferred

20 out since he commingled funds for all of the CallSocket Entities and never maintained discrete

21 accounts that kept investor funds segregated by entity.

22     100.    Even if the investor funds could be traced and had not been comingled, it is clear

23 from the financial records of the CallSocket Entities that limited partner investment capital was

24 used for many purposes other than investments solely in the CallSocket LPs, including, among other

25 things, to speculate in and improve commercial real estate, to invest in or pay the expenses for

26 numerous other Henderson Entities, to pay the expenses of defendant SFRC and its employees, and

27 to pay finders' fees for bringing in new investors.

28     101.    Contrary to the representations by the Henderson Defendants in the Offering

- 23 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF; CASE NO. RG15-787491

Documents, the general partner did not only make investments that met the job creation requirements of the EB-5 program. It is clear from the financial records of the CallSocket LPs that millions of dollars of investor money was used by the Henderson Defendants to finance purchases of real property and investments in other Henderson Entities. Defendant Henderson, though, represented under oath to the USCIS that the three CallSocket LPs did not invest in any business entities that created or maintained jobs for EB-5 purposes. Therefore, according to defendant Henderson, none of these investments in other business entities met the job creation requirements of the EB-5 program.

102.    Contrary to the representations by the Henderson Defendants in the Offering Documents, defendant SFRC received tens of millions of dollars of improper payments from the CallSocket LPs that were well in excess of and entirely unrelated to the amounts due to the general partner of each limited partnership for syndication fees, the annual management fee and the cash flow from operating cash and return of investments. In fact, all investor funds, totaling more than $53 million, ultimately were paid to defendant SFRC by the CallSocket LPs.

103.    Contrary to the representations by the Henderson Defendants in the Offering Documents, the ordinary and recurring expenses of the CallSocket LPs were not paid by the general partner of each limited partnership out of the annual management fee the general partner received from the limited partnership. In fact, the CallSocket LPs not only paid for their own ordinary and recurring expenses, but the ordinary and recurring expenses of defendant SFRC and its employees and other Henderson Entities as well. For example, between 2013 and 2015, when CallSocket, L.P. lost more than $19 million, defendant Matthew Henderson and others charged more than $280,000 of meals and travel expenses directly to CallSocket, L.P.

104.    Contrary to the representations by the Henderson Defendants in the Offering Documents, each of the CallSocket LPs was projected to have at least $10 million in revenues in the first year of operations, with revenues increasing each year thereafter and doubling within five years. These projections were wildly optimistic and had no basis in fact, particularly given the manner in which the Henderson Defendants ran the businesses (i.e., immediately stripping each limited partnership of all investment capital it received). CallSocket, L.P. is the only one of the

- 24 -

Case: 16-42823    Doc# 85-1    Filed: 01/13/17    Entered: 01/13/17 16:05:17    Page 27 of 49

limited partnerships that has been operating for any period of time. In its first three years of operation, its revenues totaled, for all three years, only $6.8 million, and a good part of that came not from the call center, but from rent received for the Runway location in San Francisco. CallSocket II, L.P. and CallSocket III, L.P. will never be able to achieve their revenue goals since they have no investor capital to finance operations.

105. Contrary to the representations by the Henderson Defendants in the Offering Documents, each of the CallSocket LPs was projected to be profitable in the first year of operations, with profits increasing each year thereafter. These projections also were wildly optimistic and had no basis in fact. CallSocket, L.P. is the only one of the limited partnerships that has commenced operations for more than a year. It has lost millions of dollars every single year that it has been in operation, with losses totaling more than $21 million to date. None of the CallSocket LPs has ever been or ever will be profitable, given the manner in they have been set up and run by the Henderson Defendants.

106. Contrary to the representations by the Henderson Defendants in the Offering Documents for CallSocket, L.P. and CallSocket III, L.P., the call centers are not actually located in leased spaces in Oakland, but rather in buildings that were purchased by the CallSocket LPs using the investment capital of the limited partners.

107. CallSocket, L.P. limited partner investors were never told that millions of dollars of their investment capital was going to be used to pay for the purchase and renovation of the Tribune Tower in downtown Oakland, or that the building, once purchased on behalf of the limited partners, would be used to provide rent free space to defendant SFRC, its counsel and numerous other Henderson Entities. And CallSocket III, L.P. limited partners were never told that millions of dollars of their investment capital was going to be used to pay for the purchase and renovation of the I. Magnin building in downtown Oakland.

108. Contrary to the representations by the Henderson Defendants in the Offering Documents for CallSocket II, L.P. and CallSocket III, L.P., those offerings were not being conducted to build on the success of the first CallSocket call center, because at the time of those offerings the first CallSocket call center was losing millions of dollars and was not successful. The

- 25 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES,
INJUNCTIVE AND DECLARATORY RELIEF; CASE NO. RG 15778891

Case: 16-42823    Doc# 114-3 Filed: 02/24/16 Entered: 02/24/16 15:58:10    Page 28 of 49

offerings for CallSocket II, L.P. and CallSocket III, L.P. actually were being conducted to allow the Henderson Defendants to continue taking millions of dollars of investor funds that they were not entitled to and using those funds for their own benefit.

109.    Plaintiff is informed and believes and thereon alleges that the Henderson Defendants' self-dealing, conflicts of interest, breaches of fiduciary duty, breaches of express and implied contractual obligations, and violations of California law have been ongoing since the inception of each of the CallSocket Entities and have included, without limitation, using the investments, assets, income and funds of the CallSocket Entities and/or borrowing money in the name of and/or secured by the CallSocket Entities for the purposes of secretly buying real property, personal property or businesses in defendants' own names or in the names of business entities controlled by these defendants or in which these defendants have an interest.

110.    For example, CallSocket, L.P. raised $18 million in investment capital from 36 limited partner investors. All $18 million was transferred almost immediately to defendant SFRC by defendant Henderson, commingled with SFRC's funds, the funds of other CallSocket Entities, and the funds of other Henderson Entities. According to the financial statements for CallSocket, L.P., by the end of 2015, CallSocket, L.P. was owed more than $19 million from 16 different Henderson-related entities and apparently owed almost $26 million to seven different Henderson-related entities.

111.    According to sworn testimony by defendant Henderson, millions of dollars of CallSocket, L.P. funds were used to finance the purchase of the Tribune Tower and then renovate that building, and the building is "held in trust" for the CallSocket, L.P. limited partners. But there is no record of that in any of the ownership documents for the building, and it is contrary to what the Henderson Defendants told the CallSocket, L.P. limited partners they were going to use the investment capital for. To make matters worse, the Henderson Defendants have used the Tribune Tower to provide themselves, SFRC, their counsel and numerous other Henderson Entities with a prime, rent-free downtown Oakland location in which to conduct business, squandering millions of dollars of limited partner investment capital that will never be recovered.

112.    CallSocket, L.P., which has lost millions of dollars every year and never shown a

- 26 -

profit, paid more than $6.2 million to its "management" in just three years (well in excess of salaries paid to the actual call center operators), more than $635,000 in consulting fees (including $180,000 a year to Max Shapiro, who is listed as the Director of Operations for SFRC and has no title with CallSocket, L.P.), paid $2.3 million as a finders' fee to defendant Henderson's agent in China (this was supposed to have been paid out of the separate $50,000 syndication fee each limited partner paid), paid more than $2 million for computers and IT services (half of these charges appear to be for other Henderson Entities, not CallSocket, L.P.), and paid almost $300,000 for travel, meals and entertainment for the Henderson Defendants and other management.

113.    In order to conceal the wrongdoing described above, the Henderson Defendants have completely frozen plaintiff out of the management, control and operations of the CallSocket Entities and have refused to permit plaintiff any access to the books and records of the CallSocket Entities, despite repeated demands therefor.  These defendants also have failed and refused to provide an accounting, tax documents and financial statements to plaintiff.  And they have failed to make full disclosure to plaintiff regarding interested party transactions and properly make distributions and allocate net profits and losses among the members/limited partners of the CallSocket Entities in compliance with the CallSocket Operating Agreements and Offering Documents.

**The Breaches of the CallSocket Operating Agreements and Offering Documents and Violations of California Law Alleged Herein are Part of a Pattern of Misconduct by the Henderson Defendants**

114.    This is, unfortunately, hardly the first time that defendant Henderson, his sons and some of the business entities he operates through have been sued by business partners alleging breaches of contract, breaches of fiduciary duty, fraud, conversion and other violations of California law.

115.    In August 2014, the Henderson Defendants were sued by another business partner, an Oakland restauranteur, for breach of contract, breach of fiduciary duty, conversion, intentional misrepresentation, conspiracy and intentional interference with contractual relations.  The plaintiff in that case alleged that the Hendersons and SFRC had conspired to take control of the partnership's assets and the partnership, engaged in unauthorized transfers of partnership assets,

- 27 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF, CASE NO. 16-15 7 78 91

Case: 16-42823    Doc# 71   Filed: 04/14/17   Entered: 04/14/17 13:7:39   Page 30 of 49

opened undisclosed bank accounts to which partnership funds were being diverted, and refused to provide the plaintiff with financial information and documents he was entitled to under the partnership agreement. The litigation was quickly settled by the Hendersons and SFRC in a confidential multi-million dollar settlement.

116. More recently, in September 2015, defendants Henderson and SFRD were sued by yet another business partner for breach of contract, intentional misrepresentation and money lent. The plaintiff in that case, a non-profit community organization in Oakland, alleges that Henderson and SFRC conspired to defraud the plaintiff of its ownership interest in a multi-million dollar Oakland property by entering into a partnership agreement with the plaintiff to obtain a controlling 75% interest in the property in exchange for a $3.7 million note and an agreement to raise funds to rehabilitate the property. As soon as the agreement was signed and the controlling interest in the property was transferred to Henderson and SFRC, they immediately defaulted on the note, made no payments to plaintiff and have raised no funds to rehabilitate the property.

117. Plaintiff is informed and believes and thereon alleges that defendant Henderson is also under investigation by at least the Internal Revenue Service and the Securities and Exchange Commission in connection with his management and operation of the CallSocket Entities.

## DERIVATIVE ALLEGATIONS

118. Plaintiff brings this action, in part, derivatively for the benefit of the CallSocket Entities and their members and limited partners (with the exception of any of the defendants named herein) to redress injuries suffered and to be suffered by the CallSocket Entities and their members and limited partners as a direct result of the breaches of fiduciary duties, acts of conversion and breaches of contract by defendants.

119. Plaintiff has been a member in and owner of each of the CallSocket LLCs during the wrongful course of conduct by defendants as alleged herein, and plaintiff continues to be a member in and owner of each of the CallSocket LLCs. As a member in and owner of each of the CallSocket LLCs, plaintiff also has an interest in each of the CallSocket LPs.

120. Plaintiff will adequately and fairly represent the interests of the CallSocket Entities and their members and limited partners in enforcing and prosecuting their rights and has retained

- 28 -

1  counsel competent and experienced in derivative litigation.

2      121.   Plaintiff has not made a demand on the CallSocket Entities to bring suit asserting

3  the derivative claims set forth herein because the CallSocket Entities are completely controlled and

4  dominated by the Henderson Defendants. The Henderson Defendants suffer from conflicts of

5  interest and divided loyalties which preclude them from exercising independent business judgment.

6      122.   Demand on the CallSocket Entities would be futile because: (a) the CallSocket

7  Entities are completely controlled and dominated by the Henderson Defendants; (b) plaintiff has

8  been completely frozen out of the business and operations of the CallSocket Entities and despite

9  repeated requests to his co-owners for access to the books and records of the CallSocket Entities,

10  plaintiff has been denied such access; (c) the Henderson Defendants and Henderson Entities have

11  been engaging in a continuing course of self-dealing using the assets and funds of the CallSocket

12  Entities for their personal use and benefit unrelated to any legitimate company purpose and to the

13  detriment of plaintiff and the CallSocket Entities; and (d) the Henderson Defendants are neither

14  disinterested nor independent.

15  <div align="center">

**FIRST CAUSE OF ACTION**

</div>

16  <div align="center">

**BREACH OF FIDUCIARY DUTY**

**(Asserted by Plaintiff Derivatively on Behalf of the CallSocket Entities and Their**

17  **Members/Limited Partners against Defendants Henderson and SFRC)**

</div>

18      123.   Plaintiff incorporates by reference and realleges paragraphs 1 through 122 above.

19  This cause of action is brought by plaintiff derivatively on behalf of the CallSocket Entities and

20  their members/limited partners against defendants Henderson and SFRC.

21      124.   As controlling members and managers of the CallSocket Entities, defendants

22  Henderson and SFRC owe the CallSocket Entities and their members/limited partners a fiduciary

23  duty pursuant to law, under the CallSocket Operating Agreements and Offering Documents, and as

24  a result of the trust and confidence placed in them by the CallSocket Entities. Defendants

25  Henderson and SFRC's duties include, without limitation, obligations on their part to deal honestly

26  and with forthrightness with the CallSocket Entities and their members/limited partners, to

27  investigate and manage matters material to the interests the CallSocket Entities diligently and to the

28

<div align="center">

- 29 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES,
INJUNCTIVE AND DECLARATORY RELIEF; CASE NO. RG15787691

</div>

best of their ability, duties of loyalty and due care, to avoid self-dealing, to avoid conflicts of interest in connection with the management of the CallSocket Entities, to avoid securing an advantage over the CallSocket Entities and their members/limited partners, and to disclose to the CallSocket Entities and their members/limited partners any and all matters material to the interests the members/limited partners or the CallSocket Entities as a whole.

125.    As detailed in paragraphs 85 – 91 and 97 - 113 above, defendants Henderson and SFRC have been engaging in a continuing course of self-dealing using the assets and funds of the CallSocket Entities for their personal use and benefit unrelated to any legitimate company purpose and to the detriment of the CallSocket Entities and their members/limited partners.  Defendants Henderson and SFRC's self-dealing, conflicts of interest and breaches of fiduciary duty have been ongoing since the inception of each of the CallSocket Entities and have included, without limitation, using the assets and funds of the CallSocket Entities and/or borrowing money in the name of and/or secured by the CallSocket Entities for the purposes of secretly buying real property, personal property or businesses in defendants' own names or in the names of business entities controlled by defendants or in which defendants have an interest.

126.    By reason of the foregoing actions and inactions set forth in paragraphs 85 – 91 and 97 - 113 above, defendants Henderson and SFRC willfully breached their fiduciary duties and proximately caused damages to the CallSocket Entities and their members/limited partners in an amount to be proven at trial.  The members/limited partners' and CallSocket Entities' damages include, without limitation, the assets, funds or monies misappropriated and converted by defendants, reasonable use value on misappropriated and converted property, lost rental and business income resulting from defendants' self-dealing, conflicts of interest and breaches of fiduciary duties as herein above alleged, and reputational damages in an amount to be proven at trial..

127.    As a further proximate result of the wrongful conduct of defendants Henderson and SFRC as alleged above, the CallSocket Entities and their members/limited partners are entitled to imposition of a constructive trust upon defendants' interest in any assets or businesses acquired, improved, maintained, or for which the debt or operating expenses were paid with investment assets

- 30 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF, CASE NO. RG 15772801

Case: 16-42823    Doc# 55-10    Filed: 04/10/17    Entered: 04/10/17 16:51:38    Page 33 of 49

1   or funds of the CallSocket Entities or with funds obtained through loans in the name of the

2   CallSocket Entities or secured by the assets or property of the CallSocket Entities.

3       128.    Additionally, to the extent defendants have since sold or transferred assets obtained,

4   improved or serviced with assets or funds of the CallSocket Entities or the fruits of assets or funds

5   which can be traced to the CallSocket Entities, the CallSocket Entities and their members/limited

6   partners are entitled to the imposition of a constructive trust against any real or personal property,

7   tangible or intangible, which can be traced to said sold or transferred property or the CallSocket

8   Entities' assets or funds.

9   <center>**SECOND CAUSE OF ACTION**</center>

10  <center>**CONVERSION**</center>

11  <center>**(Asserted by Plaintiff Derivatively on Behalf of the CallSocket Entities and
    Their Members/Limited Partners against Defendants Henderson, SFRC and
    the Henderson Entities)**</center>

12

13      129.    Plaintiff incorporates by reference and realleges paragraphs 1 through 122 above.

14  This cause of action is brought by plaintiff derivatively on behalf of the CallSocket Entities and

15  their members/limited partners against defendants Henderson, SFRC and the Henderson Entities.

16      130.    Plaintiff alleges that defendants Henderson, SFRC and the Henderson Entities,

17  without the knowledge or consent of the CallSocket Entities or their members/limited partners,

18  have converted investments, assets, income or funds of the CallSocket Entities and transferred

19  such investments, assets, income or funds into bank accounts upon which neither the CallSocket

20  Entities nor their members/limited partners are authorized signatories or account holders. Plaintiff

21  further alleges that defendants Henderson, SFRC and the Henderson Entities have used and

22  converted investments, assets, income or funds belonging to the CallSocket Entities for non-

23  company purposes including, without limitation, defendants' acquisition, improvement or

24  maintenance of real property, personal property, business entities and other assets in defendants'

25  own names or in the names of persons or entities controlled by defendants.

26      131.    Plaintiff alleges that defendants Henderson, SFRC and the Henderson Entities have

27  misappropriated property of the CallSocket Entities for their own exclusive use to the detriment

28  the CallSocket Entities and their members/limited partners. The information from which plaintiff

<center>- 31 -</center>

<center>VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES,
INJUNCTIVE AND DECLARATORY RELIEF; CASE NO. CGC-13-748491</center>

can determine the precise nature and extent of defendants' conversion and the specific identity of company assets converted by defendants is believed to be within defendants' sole knowledge and control. Plaintiff will seek leave to amend this complaint when the precise nature of defendants' conversion has been ascertained or according to proof at trial.

132. Plaintiff alleges that the conduct of defendants Henderson, SFRC and the Henderson Entities, and each of them, as set forth in paragraphs 85 – 91 and 97 - 113 above, was done with the intent to cause injury and damage to the CallSocket Entities and their members/limited partners, and for defendants' own personal profit, and that defendants' conduct as hereinabove alleged has caused such injury and damage. The CallSocket Entities' damages include, without limitation, the value of all property wrongfully converted and any profits derived by defendants as a result of the converted property to disgorge them of unjust enrichment. Additionally, said conduct of defendants intentionally subjected the CallSocket Entities and their members/limited partners to unjust hardship. Said conduct was carried on with the intention on the part of defendants to deprive the CallSocket Entities and their members/limited partners of property and legal rights and to otherwise proximately cause damage by converting cash and other property to defendants' personal use and benefit.

133. As a further proximate result of the wrongful conduct of defendants Henderson, SFRC and the Henderson Entities as alleged above, the CallSocket Entities and their members/limited partners are entitled to imposition of a constructive trust upon defendants' interest in any assets acquired, improved or maintained (including, without limitation, any real or personal property and any businesses) or for which the debt or operating expenses were paid with assets, investments, income or funds of the CallSocket Entities or assets, investments, income or funds traceable to the CallSocket Entities.

134. In addition, to the extent defendants have since sold or transferred assets obtained, improved or serviced with assets, investments, income or funds belonging to the CallSocket Entities, or earned interest or other income or assets from their conversion of the CallSocket Entities' property, the CallSocket Entities and their members/limited partners are entitled to the imposition of a constructive trust against any real or personal property, tangible or intangible,

- 32 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF; CASE NO. RG13778891

Case: 16-42823    Doc# 35-1    Filed: 10/14/16    Entered: 10/14/16 15:19:40    Page 35 of 49

which can be traced to said sold or transferred property or the CallSocket Entities' assets or funds.

### THIRD CAUSE OF ACTION

### BREACH OF CONTRACT

**(Asserted by Plaintiff Derivatively on Behalf of the CallSocket Entities and Their Members/Limited Partners against Defendants Henderson and SFRC)**

135.    Plaintiff incorporates by reference and realleges paragraphs 1 through 122 above. This cause of action is brought by plaintiff derivatively on behalf of the CallSocket Entities and their members/limited partners against defendants Henderson and SFRC.

136.    The CallSocket Operating Agreements and Offering Documents contains specified conditions, covenants and promises for the benefit of plaintiff and the CallSocket Entities.

137.    Defendants Henderson and SFRC have not performed, and have failed and refused to perform, the obligations and conditions of the CallSocket Operating Agreements and Offering Documents on their part to be performed, for the reasons set forth in paragraphs 85 – 91 and 97 - 113 above.

138.    As alleged in those paragraphs, defendants Henderson and SFRC have been engaging in a continuing course of self-dealing using the assets and funds of the CallSocket Entities for their personal use and benefit unrelated to any legitimate company purpose, and to the detriment of plaintiff and the CallSocket Entities. Defendants Henderson and SFRC's self-dealing, conflicts of interest and breaches of express and implied contractual obligations have been ongoing since the inception of the CallSocket Entities and have included, without limitation, acts within the four year period immediately preceding the filing of this action.

139.    As a direct and proximate result of the aforesaid breaches of the CallSocket Operating Agreements and Offering Documents by defendants Henderson and SFRC, the CallSocket Entities and their members/limited partners have suffered damages, including incidental and consequential damages, in an amount to be proven at trial.

//

//

//

- 33 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF, CASE NO. GGI-5748

Case: 16-42823    Doc# 35    Filed 04/14/16    Entered 04/14/16 16:15:48    Page 36 of 49

# FOURTH CAUSE OF ACTION

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING -
### (Asserted by Plaintiff Derivatively on Behalf of the CallSocket Entities and Their Members/Limited Partners against Defendants Henderson and SFRC)

140.     Plaintiff incorporates by reference and realleges paragraphs 1 through 122 above. This cause of action is brought by plaintiff derivatively on behalf of the CallSocket Entities and their members/limited partners against defendants Henderson and SFRC.

141.     The powers, duties and obligations of the members and managers of the CallSocket Entities are set forth in the CallSocket Operating Agreements and Offering Documents.  These materials are described in paragraphs 76 – 84 and 92 - 95 above.

142.     Implied into each of these documents and every contract entered into in the State of California are covenants of good faith and fair dealing.  Also implied into these documents is a covenant that defendants Henderson and SFRC, as members or managers of the CallSocket Entities, will only use their power and authority as members or managers to act in furtherance of the best interests of the CallSocket Entities and their members/limited partners, and not to further the separate and conflicting interests of defendants.

143.     By their actions, described in paragraphs 85 – 91 and 97 - 113 above, defendants Henderson and SFRC have deprived the CallSocket Entities and their members/limited partners of the benefit of their bargains, and breached the implied covenant of good faith and fair dealing inherent in the CallSocket Operating Agreements and Offering Documents.

144.     As a direct and proximate result of the aforesaid breaches by defendants Henderson and SFRC, the CallSocket Entities and their members/limited partners have suffered damages, including incidental and consequential damages, in an amount to be proven at trial.

# FIFTH CAUSE OF ACTION

## DECLARATORY RELIEF
### (Asserted by Plaintiff Derivatively on Behalf of the CallSocket Entities and Their Members/Limited Partners against all Defendants)

145.     Plaintiff incorporates by reference and realleges paragraphs 1 through 122 above. This cause of action is brought by plaintiff derivatively on behalf of the CallSocket Entities and

- 34 -

their members/limited partners against all defendants.

146. The powers, duties and obligations of the members, managers and limited partners of the CallSocket Entities are set forth in the CallSocket Operating Agreements and Offering Documents. These materials are described in paragraphs 76 - 84 and 92 - 95 above.

147. An actual controversy has now arisen between the CallSocket Entities and their members/limited partners, on the one hand, and defendants on the other hand, regarding the CallSocket Operating Agreements and Offering Documents and the rights and obligations of the parties thereunder.

148. The dispute includes a disagreement regarding the rights under the CallSocket Operating Agreements of the members to inspect the books and records of the CallSocket Entities, these members' rights to an accounting of the assets and liabilities of the CallSocket Entities, and the members' rights under the CallSocket Operating Agreements to a share of any monies, income or profits derived from or traceable to defendants' use, diversion, misappropriation or investment of assets, funds or income belonging to the CallSocket Entities.

149. A judicial declaration resolving this dispute is necessary and appropriate so that plaintiff, derivatively and on behalf of the CallSocket Entities and their members/limited partners, may ascertain the rights and duties of the m members/limited partners under the CallSocket Operating Agreements and Offering Documents, whether defendants are in breach of those Agreements, and what rights the CallSocket Entities and their members/limited partners have with respect to any monies, income or profits derived from or traceable to defendants' use, diversion, misappropriation or investment of assets, funds or income belonging to the CallSocket Entities.

## SIXTH CAUSE OF ACTION

### BREACH OF CONTRACT

**(Asserted by Plaintiff Individually Against Defendants Henderson and SFRC)**

150. Plaintiff incorporates by reference and realleges paragraphs 1 through 122 above. This cause of action is brought by plaintiff as against defendants Henderson and SFRC.

151. Plaintiff entered into agreements with defendants Henderson and SFRC to form the CallSocket Entities. These agreements are described in paragraphs 76 - 84 above. Pursuant to those

- 35 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF; CASE NO. RG 15-758491

Case: 16-42823    Doc# 55-1   Filed: 04/04/16   Entered: 04/04/16 15:17:30    Page 38 of 49

agreements, plaintiff is a member and manager of each of the CallSocket LLCs, and possesses an
ownership interest in each company, as alleged above.

152.    Plaintiff has performed all conditions, covenants and promises required on his part
to be performed in accordance with the terms and conditions of the agreements.

153.    Each CallSocket Operating Agreement contains specified conditions, covenants and
promises for the benefit of plaintiff and the CallSocket LLCs.  These conditions, covenants and
promises include the provisions of paragraph 4.3, which expressly prohibit any single member of
the CallSocket LLCs from exchanging or disposing of company assets without first obtaining the
affirmative vote or written consent of members holding a majority interest.  Similarly, paragraph
4.7 of the CallSocket Operating Agreements prohibits any single manager of the CallSocket LLCs
from engaging in any transaction with the company that would personally benefit the manager
without full and complete disclosure to the members and the express approval of disinterested
members holding a majority interest.

154.    Paragraph 5.6 of the CallSocket Operating Agreements discuss member
distributions, and provide that "Distributable Cash" earned or generated from CallSocket Entity
funds or investments are to be distributed "to the Members in proportion to their Percentage
Interests."

155.    Paragraphs 8.1 through 8.3 of the CallSocket Operating Agreements provide that
plaintiff, as a member or manager of the CallSocket LLCs, must routinely be provided balance
sheets and detailed financial information concerning the operations of, and transactions affecting,
the CallSocket LLCs.  These provisions also guarantee that plaintiff may access and inspect the
books and records of the CallSocket LLCs for any legitimate business reason, at any time upon
reasonable request.

156.    Defendants Henderson and SFRC have not performed, and have failed and refused
to perform, the obligations and conditions of the CallSocket Operating Agreements on their part to
be performed, for the reasons set forth in paragraphs 85 – 91 above.

157.    As alleged in those paragraphs, defendants Henderson and SFRC have been
engaging in a continuing course of self-dealing using the assets and funds of the CallSocket Entities

- 36 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES,
INJUNCTIVE AND DECLARATORY RELIEF, CASE NO. 16-17840

Case: 16-42823    Doc# 55-5    Filed: 05/23/16    Entered: 05/23/16 14:19:21    Page 39
of 49

1  for their personal use and benefit unrelated to any legitimate company purpose, and to the detriment

2  of plaintiff. Defendants Henderson and SFRC's self-dealing, conflicts of interest and breaches of

3  express and implied contractual obligations have been ongoing since the inception of the CallSocket

4  Entities and have included, without limitation, acts within the four year period immediately

5  preceding the filing of this action.

6       158. Furthermore, as a result of defendants' misconduct and self-dealing as alleged in

7  paragraphs 85 – 91 and 97 - 113 above, defendants Henderson and SFRC have failed to provide

8  plaintiff, as a member or manager of the CallSocket LLCs, with balance sheets and detailed

9  financial information concerning the operations of, and transactions affecting, the CallSocket

10  Entities, in violation of paragraphs 8.1 through 8.3 of the CallSocket Operating Agreements.

11  Defendants Henderson and SFRC also have failed to "Distribute Cash" owed to plaintiff, in

12  proportion to his percentage interest in the CallSocket LLCs, for monies or profits earned or

13  generated from CallSocket Entity funds or investments, in violation of paragraph 5.6 of the

14  CallSocket Operating Agreements.

15       159. As a direct and proximate result of the aforesaid breaches of the CallSocket

16  Operating Agreements by defendants Henderson and SFRC, plaintiff has suffered damages,

17  including incidental and consequential damages, in an amount to be proven at trial.

18  <div align="center">**SEVENTH CAUSE OF ACTION**</div>

19  <div align="center">**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**</div>

20  <div align="center">**(Asserted by Plaintiff Individually against Defendants Henderson and SFRC)**</div>

21       160. Plaintiff incorporates by reference and realleges paragraphs 1 through 122 above.

22  This cause of action is brought by plaintiff against defendants Henderson and SFRC.

23       161. The powers, duties and obligations of the members and mangers of the CallSocket

24  LLCs are set forth in the written CallSocket Operating Agreements. These Agreements are

25  described in paragraphs 76 - 84 above.

26       162. Implied into each CallSocket Operating Agreement and every contract entered into

27  in the State of California are covenants of good faith and fair dealing. Also implied into the

28  CallSocket Operating Agreements is a covenant that defendants Henderson and SFRC, as members

<div align="center">- 37 -</div>

<div align="center">VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES,
INJUNCTIVE AND DECLARATORY RELIEF, CASE NO. RG-15178891</div>

Case: 16-42823   Doc# 49-2  Filed: 11/21/16  Entered: 11/21/16 15:17:34  Page 40
of 49

or managers of the CallSocket LLCs, will only use their power and authority as members or managers to act in furtherance of the best interests of the CallSocket LLCs and their members, and not to further the separate and conflicting interests of defendants.

163. By their actions, described in paragraphs 85 – 91 and 97 - 113 above, defendants Henderson and SFRC have deprived plaintiff of the benefit of his bargain, and breached the implied covenant of good faith and fair dealing owed to plaintiff that is inherent in the CallSocket Operating Agreements.

164. As a direct and proximate result of the aforesaid breaches of the implied covenant and good faith and fair dealing by defendants Henderson and SFRC, plaintiff has suffered damages, including incidental and consequential damages, in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY

### (Asserted by Plaintiff Individually against Defendants Henderson and SFRC)

165. Plaintiff incorporates by reference and realleges paragraphs 1 through 122 above. This cause of action is brought by plaintiff against defendants Henderson and SFRC.

166. As controlling members and managers of the CallSocket LLCs, defendants Henderson and SFRC are fiduciaries and owe the highest duty of loyalty, care and good faith to plaintiff pursuant to law, under the CallSocket Operating Agreements, and as a result of the trust and confidence placed in them by plaintiff. Defendants Henderson and SFRC's duties include, without limitation, obligations on their part to deal honestly and with forthrightness with plaintiff, to investigate and manage matters material to the interests of plaintiff diligently and to the best of their ability, duties of loyalty and due care, to avoid self-dealing, to avoid conflicts of interest in connection with the management of the CallSocket LLCs, to avoid securing and advantage over plaintiff, and to disclose to plaintiff any and all matters material to the interests of plaintiff.

167. Defendants Henderson and SFRC breached their fiduciary duties to plaintiff by completely freezing plaintiff out of the management, control and operations of the CallSocket LLCs in order to conceal the wrongdoing described in paragraphs 85 – 91 and 97 – 113, failing to make full disclosure to plaintiff regarding interested party transactions, failing to properly make

- 38 -

Case: 16-42823    Doc# 35-4    Filed: 10/14/16    Entered: 10/14/16 16:18:40    Page 41 of 49

distributions and allocate net profits and losses among the members of the CallSocket LLCs in compliance with the CallSocket Operating Agreements, and claiming that plaintiff has no ownership in any of the CallSocket LLCs.

168. By reason of the foregoing actions, defendants Henderson and SFRC willfully breached their fiduciary duties and proximately caused damages to plaintiff in an amount to be proven at trial. Plaintiff's damages include, without limitation, the distributions and net profits that plaintiff is entitled to but defendants have failed to provide in violation of the CallSocket Operating Agreements.

169. Plaintiff is informed and believes and thereon alleges that the conduct of defendants, and each of them, was oppressive, fraudulent or malicious. Said conduct was intended by defendants to cause injury to plaintiff, and did cause injury to plaintiff, for defendants' own personal profit. Said conduct of defendants was carried out with a conscious disregard of the rights and interests of plaintiff.

170. Plaintiffs is informed and believes and thereon alleges that defendants' breaches of fiduciary duty as hereinabove alleged was wanton, willful, and in conscious disregard of the rights and interests of plaintiff, thereby entitling plaintiff to punitive damages in an amount appropriate to punish defendants as will be proven at trial.

## NINTH CAUSE OF ACTION

### DECLARATORY RELIEF

**(Asserted by Plaintiff Individually against the Henderson Defendants)**

171. Plaintiff incorporates by reference and realleges paragraphs 1 through 122 above. This cause of action is brought by plaintiff against the Henderson Defendants.

172. Plaintiff entered into agreements with defendants Henderson and SFRC to form the CallSocket LLCs. These Agreements are described in paragraphs 76 – 84 above.

173. An actual controversy has now arisen between plaintiff and defendants regarding the CallSocket Operating Agreements and the rights and obligations of the parties thereunder.

174. The dispute includes a disagreement regarding plaintiff's rights under the CallSocket Operating Agreements to inspect the books and records of the CallSocket LLCs, his rights to an

- 39 -

accounting of the assets and liabilities of the CallSocket LLCs, and his rights under the CallSocket Operating Agreements to a share of any monies, income or profits derived from or traceable to defendants' use, diversion, misappropriation or investment of assets, funds or income belonging to the CallSocket Entities.

175.   A judicial declaration resolving this dispute is necessary and appropriate so that plaintiff may ascertain his rights and duties under the CallSocket Operating Agreements, whether defendants are in breach of those Agreements, and what rights plaintiff has with respect to any monies, income or profits derived from or traceable to defendants' use, diversion, misappropriation or investment of assets, funds or income belonging to the CallSocket Entities.

## TENTH CAUSE OF ACTION

### DEMAND FOR BOOKS AND RECORDS OF CALIFORNIA LIMITED LIABILITY COMPANIES

### (Asserted by Plaintiff Individually against Defendants Henderson and SFRC)

176.   Plaintiff incorporates by reference and realleges paragraphs 1 through 122 above. This cause of action is brought by plaintiff against defendants Henderson and SFRC.

177.   Plaintiff entered into agreements with defendants Henderson and SFRC to form the CallSocket Entities. These agreements are described in paragraphs 76 – 84 and 92 - 95 above.

178.   Plaintiff has a contractual right as a member and manager under the CallSocket Operating Agreements, upon reasonable request for purposes reasonably related to his interests as a member or manager, to inspect and copy the books and records of the CallSocket LLCs – including books and records reflecting company transactions, financial statements of the company, tax returns and reports, and books and records as they relate to the internal affairs of the company for at least the current and past four fiscal years.

179.   Plaintiff has made multiple demands on defendants Henderson and SFRC, related to his interests as a member and manager to inspect and copy the books and records of the CallSocket LLCs. Notwithstanding the terms of the CallSocket Operating Agreements, defendants Henderson and SFRC have failed and refused to permit plaintiff access to the books and records of the CallSocket LLCs in which plaintiff has an ownership interest.

- 40 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF; CASE NO. RG-15-778891

Case: 16-42823   Doc# 35   Filed: 10/14/16   Entered: 10/14/16 16:18:40   Page 43 of 49

180. Plaintiff requires access to the books and records of the CallSocket LLCs in which he has an ownership interest in order to, among other things, reimburse plaintiff for damages caused by defendants as alleged herein.

181. Accordingly, plaintiff requests as relief that which has been denied him by defendants Henderson and SFRC: a court order that plaintiff shall be granted immediate access to, and the right to inspect and copy, the complete books and records of the CallSocket LLCs as provided for in the CallSocket Operating Agreements.

## ELEVENTH CAUSE OF ACTION

### VIOLATION OF CALIFORNIA CORPORATIONS CODE, §§ 17701.01 *et seq.*

### (Asserted by Plaintiff Individually against Defendants Henderson and SFRC)

182. Plaintiff incorporates by reference and realleges paragraphs 1 through 122 above. This action is brought by plaintiff against defendants Henderson and SFRC.

183. Pursuant to Corporations Code § 17704.10, each member or manager of a limited liability company has the right to, upon reasonable request, for purposes reasonably related to the interest of that person as a member or manager to inspect and copy any of the records required to be maintained pursuant to § 17701.13, including the limited liability company's federal, state, and local income tax or information returns and reports, if any, for the six most recent fiscal years, copies of the financial statement of the limited liability company, if any, for the six most recent fiscal years, and the books and records of the limited liability company as they relate to the internal affairs of the limited liability company for at least the current and past four fiscal years.

184. Plaintiff has a statutory right as a member and manager of the CallSocket LLCs, upon reasonable request for purposes reasonably related to his interests as a member and manager, to inspect and copy the books and records of the CallSocket LLCs – including books and records reflecting company transactions, financial statements of the company, tax returns and reports, and books and records as they relate to the internal affairs of the company for at least the current and past four fiscal year.

185. Plaintiff has made multiple demands on defendants Henderson and SFRC, related to his interests as a member and manager to inspect and copy the books and records of the CallSocket

- 41 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES
INJUNCTIVE AND DECLARATORY RELIEF; CASE NO: RG-15-778891

Case: 16-42823    Doc# 35-1    Filed: 10/14/16    Entered: 10/14/16 15:18:40    Page 44
of 49

LLCs. Notwithstanding the statutory obligations under Corporations Code § 11704.10, defendants Henderson and SFRC have failed and refused to permit plaintiff access to the books and records of the CallSocket LLCs in which plaintiff has an ownership interest.

186.     Plaintiff requires access to the books and records of the CallSocket LLCs in which he has an ownership interest in order to, among other things, prove up the legal claims plaintiff asserts in this verified complaint, and to reimburse plaintiff for any damages caused by defendants as alleged herein.

187.     Accordingly, plaintiff requests as a relief that which has been denied him by defendants Henderson and SFRC: a court order that plaintiff shall be granted immediate access to, and the right to inspect and copy, the complete books and records of the CallSocket LLCs as provided for under Corporations Code § 11704.10.

## TWELFTH CAUSE OF ACTION

### ACCOUNTING

**(Asserted on Behalf of Plaintiff Individually, and Derivatively on Behalf of the CallSocket Entities and Their Members/Limited Partners, against all Defendants)**

188.     Plaintiff incorporates by reference and realleges paragraphs 1 through 122 above. This cause of action is brought on behalf of plaintiff and derivatively on behalf of the CallSocket Entities against all defendants.

189.     Since the inception of the CallSocket Entities, defendants have engaged in acts of self-dealing, conversion and conflicts of interest in connection with the operation of the affairs of the CallSocket Entities, as alleged above.

190.     Moreover, defendants Henderson and SFRC have failed and refused, contrary to the terms of the CallSocket Operating Agreements, to respond to plaintiff's requests to inspect and copy the books and records of the CallSocket Entities.

191.     Defendants Henderson and SFRC are in possession and control of the books, assets, accounts and records of the CallSocket Entities, and all property belonging to these Entities. The amount of company assets and liabilities is unknown to plaintiff and cannot be ascertained with an accounting of the profits and losses that occurred during the operation of the business of the

- 42 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF; CASE NO. RG-13-778891

Case: 16-42823    Doc# 35-1    Filed: 10/14/16    Entered: 10/14/16 15:18:40    Page 45 of 49

CallSocket Entities and/or business transactions involving the CallSocket Entities or investments, assets, income or funds belonging to or traceable to these Entities.

192. Further, defendants continue to collect lease and other income derived from investments, assets, income or funds belonging or traceable to the CallSocket Entities, and plaintiff is informed and believes and thereon alleges that defendants continue to misappropriate, convert and apply those funds for their own personal benefit to the detriment of plaintiff and the CallSocket Entities.

193. Plaintiff, by virtue of his ownership interest in the CallSocket LLCs and interest in the profits and income of the CallSocket LPs, is entitled to and has demanded an accounting of the assets and liabilities of these Entities, and plaintiff requires such an accounting to ascertain the amounts due under the Paragraph 5.6 of the CallSocket Operating Agreements, which provide that plaintiff is entitled to a proportional share (based on his percentage interest) of any monies, income or profits derived from or traceable to defendants' use, diversion, misappropriation or investment of assets, funds or income belonging to the CallSocket Entities. Defendants have failed and refused, and continue to fail and refuse, to provide an accounting as requested by plaintiff.

194. Accordingly, plaintiff requests the assistance of the Court and demands a complete accounting of the assets and liabilities of the CallSocket Entities, including but not limited any and all transactions affecting the CallSocket Entities and all investments, assets, income or funds belonging or traceable to such Entities, together with an accounting of any and all "Cash Distributions" that should have been made or are due and owing to plaintiff under Paragraph 5.6 of the CallSocket Operating Agreements.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully prays that this Court grant the following relief:

(1) For general, compensatory and incidental damages according to proof at trial;

(2) For special damages in an amount according to proof at trial;

(3) For punitive damages in an amount sufficient to punish and set an example of defendants for their malicious, oppressive or fraudulent conduct, according to proof at trial;

- 43 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF; CASE NO. BC615891

Case: 16-42823    Doc# 154-11   Filed: 12/04/18   Entered: 12/04/18 16:37:05   Page 46 of 49

| | |
|---|---|
| 1 | (4) For the market value of all property of the CallSocket Entities misappropriated by |
| 2 | defendants, and each of them, including any property or business acquired through |
| 3 | defendants' use of investments, assets, property, income or funds belonging or |
| 4 | traceable to the CallSocket Entities, any income or profits derived therefrom and any |
| 5 | property or assets obtained through the transfer of any such property; |
| 6 | (5) For an order immediately granting plaintiff the right to access, inspect and copy the |
| 7 | books and records of the CallSocket Entities; |
| 8 | (6) For an accounting of the affairs of the CallSocket Entities from July 2011 through |
| 9 | the present, that the account be settled between plaintiff and defendants and that |
| 10 | plaintiff have judgment against defendants for such sums as may be found due and |
| 11 | owing under such accounting; |
| 12 | (7) For a temporary restraining order, a preliminary injunction and a permanent |
| 13 | injunction, all enjoining defendants and their agents, servants and employees and all |
| 14 | persons acting under, in concert with, or for them from transferring, depleting, |
| 15 | destroying, diverting or misappropriating investments, assets, income or funds |
| 16 | belonging or traceable to the CallSocket Entities in which plaintiff has an ownership |
| 17 | interest, or otherwise spending monies belonging or traceable to the CallSocket |
| 18 | Entities, without the express written consent of plaintiff or the Court; |
| 19 | (8) For an order requiring defendants, and each of them, to pay back all funds or other |
| 20 | property wrongfully diverted from the CallSocket Entities along with all profits |
| 21 | derived therefrom; |
| 22 | (9) For an order imposing a constructive trust on all investments, assets, income, funds |
| 23 | or other property misappropriated by defendants, and each of them, including any |
| 24 | business or property acquired through the use of investments, assets, income or funds |
| 25 | of the CallSocket Entities, any income or profits derived therefrom and any property |
| 26 | or assets obtained through the transfer of any such property; |
| 27 | (10) For costs of suit; |
| 28 | |

- 44 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF; CASE NO. RG13758891

Case: 16-42823    Doc# 251-11 Filed: 10/24/18 Entered: 10/24/18 13:37:89 Page 47 of 49

1    (11)   For attorneys' fees pursuant to the CallSocket Operating Agreements and California

2           law;

3    (12)   For pre-judgment and post-judgment interest at the maximum rate provided by law;

4    (13)   For a declaration of the rights of the members/limited partners of the CallSocket

5           Entities under the CallSocket Operating Agreements and Offering Documents, and

6           under the Corporations Code §§ 17701.01 et seq.;

7    (14)   For a declaration of plaintiff's rights under the CallSocket Operating Agreements;

8           and

9    (15)   For any further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for each cause of action for which he is entitled to a jury trial.

DATED: May 13, 2016.

PRITZKER LEVINE LLP

By:

Jonathan K. Levine
Elizabeth C. Pritzker
Bethany Caracuzzo
Shiho Yamamoto

Attorneys for Plaintiff Allan Young

- 45 -

VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF, CASE NO. 16-1374891

<div align="center">

**VERIFICATION**

</div>

I am the plaintiff in this action, and I have read the foregoing VERIFIED SECOND AMENDED DERIVATIVE AND DIRECT COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF and know its contents. The matters stated in that complaint are true based on my own knowledge, except as to those matters stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May 13, 2016.

Allan Young

<div align="center">

- 1 -
VERIFICATION OF ALLAN YOUNG

</div>